## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED METAL COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | 21 C 1629 |
| | ) | |
| ELKEM MATERIALS INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPNION

**Charles P. Kocoras, District Judge:**

Before the Court is Defendant/Counter-Plaintiff Elkem Materials, Inc.'s ("Elkem") Motion for Summary Judgment and Plaintiff/Counter-Defendant Allied Metal Company's ("Allied") Cross-Motion for Partial Summary Judgment. For the reasons set forth below, both motions are denied.

## BACKGROUND

As a preliminary matter, the Court notes that Elkem did not include a statement of material facts section in its motion for summary judgment, and, in responding to Allied's motion, merely "incorporated by reference" its Local Rule 56.1 statements "as if fully restated herein." Dkt. # 104, at 3. Elkem jumped straight into legal argument, assuming the Court is as familiar with the underlying events as the parties themselves, and left it to the Court to sift through the Local Rule 56.1 statements and the underlying exhibits to determine the factual background and sequence of relevant events. This

practice is frustrating, to say the least, and it places an undue burden on the Court and its staff. Courts in this district—including this Court—have repeatedly informed litigants that a Local Rule 56.1 statement is not a substitute for a statement of facts section contained in the supporting brief. *See*, *e.g.*, *Flakes v. Target Corp.*, 2019 WL 6893005, at *2 (N.D. Ill. 2019); *FirstMerit Bank, N.A. v. 2200 N. Ashland, LLC*, 2014 WL 6065817, at *4 (N.D. Ill. 2014); *Duchossois Indus., Inc. v. Crawford & Co.*, 2001 WL 59031, at *1 (N.D. Ill. 2001) ("Counsel obviously fail to understand the purpose of L.R. 56. L.R. 56.1 statements are not intended to be substitutes for a statement of facts section of a memorandum of law. Rather, their purpose is to assist the court in identifying those material, uncontested facts in the record that entitle the movant to judgment."); *McClain v. Costco Wholesale Corp.*, 2024 WL 1142001, at *1 (N.D. Ill. 2024) (Kocoras, J.). Counsel should keep this in mind for the future.

That being said, the following facts are undisputed unless otherwise noted.[1]

### The Parties

Allied is a family-owned company in the business of recycling aluminum scrap and making aluminum alloy for the diecasting industry. As part of this process, Allied uses silicon alloy which gives the metal fluidity so that in making a casting, the aluminum will flow into the company's mold.

---

[1] Any asserted facts or factual disputes that were not supported by evidence or were immaterial or otherwise inadmissible have not been included.

Elkem is the North American sales arm of Elkem ASA, a Norwegian company, and manufactures products such as SiLLOY® 170, which is an Elkem-proprietary silicon alloy product. SiLLOY® 170 is a 97% purity silicon. Elkem also manufactures SiLLOY® 130 which is a 98% purity silicon.

Allied and Elkem did business together for a number of years, during which Allied would sometimes purchase Elkem products, such as SiLLOY® 170, through quarterly, semi-annual, or annual contracts, and at times would issue spot orders on an as-needed basis. Over the last several years, Joel Fink, Allied's CEO, was the only person at Allied responsible for buying silicon, and he would place his orders directly with Richard Wolf of Elkem.

The market price of refined silicon fluctuates based on, among other things, market demand, which is referred to as the "spot market." Pricing of refined silicon also depends on the grade, with a product with a higher silicon content (e.g., 99% silicon) being a better product than silicon with a lower silicon content (e.g., 97% silicon). The monthly pricing for SiLLOY® 170 in the parties' contracts was derived from Platts Metal Week ("Platts"), which is an industry publication that publishes prices for various commodities. Allied has always preferred higher quality silicon, but purchasing decisions always depend on price.

### Pre-2020 Contracts

On August 29, 2016, Allied entered into Purchase Order 42985 to purchase 108 truckloads of product with anticipated delivery dates between January and December

3

2017 ("2017 Contract"). As acknowledged in Allied's purchase order, "We are pricing out 9 loads every month but might be late in taking a few of the months, per Joel and Tony." Dkt. # 96, ¶ 21. As of December 31, 2017, 11 truckloads[2] remained to be delivered under the 2017 Contract. Allied ordered, and Elkem delivered, the remaining 11 truckloads by February 24, 2018.

In October 2018, Allied entered into Purchase Order 44116 for delivery of 84 truckloads of SILLOY® 170 with anticipated deliveries between January and June 2019 ("1H2019 Contract"). As acknowledged in Allied's purchase order for the 1H2019 Contract, "We are pricing 14 loads every month, but we might be late in taking a few of the months, per Joel and Richard." Dkt. # 92, at 144. As of June 30, 2019, 14 truckloads remained to be delivered under the 1H2019 Contract. It is unclear from the record when those 14 truckloads were delivered.

### Purchase Order 117

On February 4, 2019, Allied entered into Purchase Order 117 ("PO 117") with Elkem for delivery of 72 truckloads of SILLOY® 170 with anticipated deliveries between July and December 2019 and a "stability"[3] between July 1, 2019, and December 31, 2019. According to PO 117, truckloads would be priced sequentially, regardless of the date of actual delivery. For example, the first 12 truckloads would be

---

[2] Elkem's Local Rule 56.1 statement of facts states that 11 truckloads remained; however, Elkem's brief in support of its motion for summary judgment states that only nine truckloads remained. *See* Dkt. # 106, ¶ 22, and Dkt. # 93, at 6.

[3] "Stability" means the term of the contract. *See* Dkt. # 92, at 80.

priced according to Platts July Average, the next 12 according to Platts August average, and so on. As acknowledged in PO 117, "We are pricing 12 loads every month but we might be late taking a few months including Dec 2019 going into Jan 2020." Dkt. # 106, ¶ 29. PO 117 included a provision stating, "All truckloads on the PO to be delivered not later than **January 15, 2020.**" Dkt. # 97-9, at 3 (emphasis in original).

During the performance of PO 117, Elkem delivered and Allied accepted the first 12 truckloads, priced according to Platts July 2019 average, in August and September 2019. The truckloads priced according to August 2019 Platts were delivered in September 2019, the truckloads priced according to September 2019 Platts average were delivered in October 2019, the truckloads priced according to October 2019 Platts pricing were delivered in November and December of 2019, and the truckloads priced according to November 2019 Platts average were delivered in December 2019 and January 2020. As of December 31, 2019, 13 truckloads remained to be delivered under PO 117.

On January 2, 2020, Mr. Wolf sent an internal email to confirm a discussion he had with Mr. Fink that Allied would take all of the SiLLOY® 170 ordered in PO 117, although those releases "may just be further deferred by a short period of time," and that Allied would take all of the truckloads in the forthcoming 2020 contract. Dkt. # 97-23, at 7.

Allied did not place any orders for delivery of any SiLLOY® 170 during January 2020, February 2020, or March 2020.

5

In an email dated March 18, 2020, Mr. Wolf asked Mr. Fink about Allied's ordering plans. In response, Mr. Fink stated that "[Allied] will honor everything [Allied has] bought." Dkt. # 97-18, at 2. Mr. Wolf responded and stated, "[p]ersonally, I have every confidence that Allied will honor its commitments...you always have!" *Id*. Mr. Wolf did not tell Allied that it was in breach of PO 117, state any reservation of rights under PO 117 with respect to delivery dates, or state that Allied should have completed all deliveries under PO 117 by January 15, 2020.

Following the March email exchange with Mr. Fink, on March 25, 2020, Mr. Wolf sent an email within Elkem stating that Allied "will honor contractual commitments but off-take will be delayed." Dkt. # 97-19, at 2.

Between April and June 2020, Allied ordered and Elkem delivered the final 13 truckloads under PO 117. The parties completed PO 117 and moved on to their next contract without Elkem having taken the position that Allied was in breach of PO 117 for not taking delivery of all 72 truckloads by January 15, 2020.

### The 2020 Contract and PO 422

In September 2019, while Elkem was still delivering truckloads pursuant to PO 117, Mr. Wolf met with Mr. Fink and Josh Gilford of Allied. During this time, silicon market pricing had fallen such that the floor pricing of SiLLOY® 170 under PO 117 was higher than market pricing.[4] During the September 2019 meeting, Mr.

---

[4] The terms governing PO 117 contained a pricing mechanism based on Platts, with a ceiling and a floor. This meant that the price Allied paid for the 72 truckloads of SiLLOY® 170 would not exceed the ceiling price, but would also not fall below the floor price.

6

Wolf offered to make a slight reduction in the floor price for SiLLOY® 170 under PO 117. Mr. Fink declined and stated that "a deal is a deal," and Elkem had "won" for that year based on the agreed pricing structure. Dkt. # 97-20, at 2. In summarizing the meeting in an internal email, Mr. Wolf added that "[Mr. Fink will] look to get some of this back next year." *Id.*

On October 22, 2019, Mr. Wolf emailed Mr. Fink proposed terms for a 2020 contract. The original proposal stated that "All truckloads on the PO to be delivered not later than **December 31, 2020**." Dkt. # 92, at 18 (emphasis in original). However, after discussing the matter with Mr. Fink, on October 29, 2019, Mr. Wolf sent a revised offer including the following language:

> Allied Metal Company will intend to release all truckloads on the PO for delivery not later than **January 31, 2021.** However, Elkem will be willing to negotiate a short extension if needed.

Dkt. # 92, at 16 (emphasis and highlighting in original).

The terms in Mr. Wolf's revised offer included a stability date of February 1, 2020, through December 31, 2020. The revised offer contemplated a volume of 10 truckloads a month with the same sequential pricing mechanism as prior contracts, where groups of 10 truckloads would be priced in sequential groups according to Platts monthly averages, regardless of date of delivery. The revised offer provided that "Elkem understands and accepts that some TL deliveries may roll over into a following month but will be billed per the sequence described below. Conversely, any deliveries pulled in early will be invoiced according to the sequential price in effect." Dkt. # 92,

at 16.  Mr. Fink confirmed acceptance of this revised offer in an email to Mr. Wolf on October 29, 2019 ("2020 Contract").

On May 4, 2020, Mr. Wolf noted in an email to Elkem ASA executives that "Allied will ultimately take all of the TL's on their 2020 contract; 110 TL's total February through December 2020."  Dkt. # 73, ¶ 19.

On May 28, 2020, Mr. Wolf forwarded his October 29, 2019 email to Mr. Fink and asked when Allied would issue its purchase order in connection with the 2020 Contract.  Specifically, Mr. Wolf stated:

> Kristy Grazier advises that we are approaching the end for deliveries against PO #117 in fulfillment of the 2019 contract. Will Allied Metal Company now be issuing its PO against the 2020 contract based upon the terms of the agreement below.

Dkt. # 97-17, at 2.  Allied responded the same day by issuing its Purchase Order 422 ("PO 422").  The stated delivery timeframe was February – December 2020.

PO 422 stated:

| Receive By | Delivery Time Frame | Vendor # | Terms |
|---|---|---|---|
| | February-December 2020 | 5154 | Net 45 |

| Quantity | Item |
|---|---|
| 4,840,000 | SILICON<br>SILLOY 170 (AS PREVIOUS)<br>*110 TRUCKLOADS*<br>10 T/Ls per month- Truckloads will be invoiced sequentially as follows regardless of the actual delivery date. Some TL deliveries may roll over into a following month but will be billed per the sequence described below. Conversely, any deliveries pulled in early will be invoiced according the sequential price in effect. |

Dkt. # 92, at 20.

*Performance of the 2020 Contract*

Allied placed its first orders under PO 422 in June 2020. The parties dispute the number of truckloads delivered in June and July 2020, but it is undisputed that as of August 31, 2020, Allied ordered and Elkem delivered 16 truckloads under PO 422.[5]

On September 15, 2020, Mr. Wolf wrote to Torbjorn Saethre, Business Director of Silicon for Elkem ASA, stating that "Allied is months behind on their contract so I don't expect that we will have any new pricing discussions until we approach the end of the current one. Allied will expect for us to honor our existing contract until it's fulfilled." Dkt. # 97-25, at 2.

On September 18, 2020, Mr. Fink contacted Mr. Wolf wanting to purchase some higher-silicon content alloy product from Elkem. Mr. Wolf was not able to provide this product, but the parties discussed plans for 2021. Later that day, Mr. Wolf sent an internal email to Mr. Saethre summarizing the conversation and stating that Mr. Fink "was happy to hear that [Elkem] will be rolling over the existing agreement [PO 422] until it's fulfilled." Dkt. # 97-26, at 2.

At a September 2020 meeting of Elkem's board of directors, Mr. Wolf indicated that volumes were "picking up" and Allied's 2020 deliveries would carry over "well into 2021." Dkt. # 97-29, at 7. At a December 2020 board meeting, Mr. Wolf indicated

---

[5] Allied appears to have included in its June count the final delivery under PO 117. *Compare* Dkt. # 92, at 153–55, *with* Dkt. # 97-24, at 1.

that volumes were "picking up" and the "2020 contract" with Allied "will carry over well into 2021." *Id.* at 9.

In October 2020, Elkem decided that it would supply the United States market with SiLLOY® 130 (98% purity silicon) and would not be shipping any more SiLLOY® 170 (97% purity silicon).

On October 15, 2020, Mr. Wolf emailed Mr. Saethre and advised him that Allied was on truckload 29 of 110. He said that assuming Allied would likely only take another 16 truckloads between that date and the end of the year, Elkem would be left with approximately 1100mt supply going into 2021. Mr. Wolf asked whether Elkem should reserve the remaining inventory of SiLLOY® 170 for Allied. Dkt. # 97-28, at 2.

As of December 31, 2020, Allied had ordered and received delivery of 47 out of 110 truckloads of SiLLOY® 170 under PO 422. This is how in December 2020, Allied was receiving truckload #47 for $0.86/lb (June 2020 pricing), when the then-current December 2020 market price would have yielded pricing of $0.97/lb.

As of January 31, 2021, Allied had ordered and received delivery of 53 out of 110 truckloads under PO 422. Elkem delivered another five truckloads in February 2021. As of March 1, 2021, Allied had ordered and received delivery of 58 out of 110 truckloads under PO 422.[6] At no point between June 2020 and February 2021 did

---

[6] Allied disputes this and says it had received 59 out of the 110 truckloads, but, again, Allied appears to have included in its June count the final delivery for PO 117. Compare Dkt. # 92, at 153–55, with Dkt. # 97-24, at 1.

Elkem discuss with Allied the pace of Allied's deliveries or insist on adherence to the delivery schedule in PO 422.

On February 26, 2021, Mr. Wolf advised Mr. Saethre that as of that date, Elkem had supplied 59 of 110 truckloads to Allied and that the next shipment "will effectively wipe out [Elkem's] SiLLOY® 170 inventory." Dkt. # 97-30, at 2–3. Mr. Wolf reiterated some of the terms of PO 422, including the provision that Allied "will intend to release all truckloads for delivery not later than January 31, 2021," and that Elkem "will be willing to negotiate a short extension if needed." *Id.* Mr. Wolf stated Elkem had two options: either allow the agreement with Allied to "run its full course" or cancel the agreement and risk losing Allied as a customer. *Id.*

In response to Mr. Wolf's February 26, 2021 email, Nils Dybwad, the director of marketing and sales for Elkem ASA and the chairman of Elkem's board, stated that, while he admittedly did not "have the full story" and did not know "what kind of agreement" Elkem had with Allied, he was "very surprised" that Elkem was still delivering against PO 422 and delivering material that should have been taken in July and August 2020. Dkt. # 97-32, at 2. Dybwad said that Allied could not "reasonably expect us to supply at this price now," and that a reasonable short extension would be one month. *Id.* He suggested Mr. Wolf "discuss a termination of the present contract with Allied as they have now had more than reasonable time to take deliver of the agreed material, and they are substantially behind," adding, "[i]n any new agreement you need to put in some sort of 'stop date.' We can't have open-ended agreements like this." *Id.*

11

Mr. Wolf contacted Mr. Fink on March 1, 2021, and summarized their conversation in an internal email to Mr. Saethre that same day. Mr. Wolf reported that he "[s]poke with Joel Fink and floated the plan as we discussed; honor contract for remaining 100mt of SiLLOY® 170 in stock and then convert over to SiLLOY® 130 at Platts minus $0.08/lb."[7] Dkt. # 97-2, at 2. Mr. Fink declined the offer and responded that Allied was ready, willing, and able to accept all the remaining loads on PO 422.

As of March 1, 2021, Elkem did not have sufficient inventory of SiLLOY® 170 to supply Allied with all undelivered truckloads of SiLLOY® 170 under PO 422. Elkem did, however, have enough inventory of either SiLLOY® 170 or SiLLOY® 130 to fulfill Allied's requests for deliveries.

Prior to March 1, 2021, Elkem never told Allied that it was converting its silicon supply to SiLLOY® 130, that it lacked sufficient inventory of SiLLOY® 170 to fulfill PO 422 as of November 2020, or that it believed PO 422 had "ended" and "expired" on December 31, 2020, and if Allied wanted to order all truckloads of SiLLOY® 170 under PO 422, Allied needed to place those orders before December 31, 2020, or any other date.

In March of 2021, Allied ordered and Elkem shipped five truckloads of SiLLOY® 170, with the last truckload delivered on March 11, 2021. Ultimately, for the 2020 Contract, Allied received the February 2020-priced material in June 2020, the

---

[7] The then-current market price for SiLLOY® 130 on March 1, 2021, even with an eight-cent discount, was higher than the price Allied paid Elkem for SiLLOY® 170 under PO 422.

March 2020-priced material in July 2020, the April 2020-priced material in September/October 2020, the May 2020-priced material in November 2020, the June 2020-priced material in December 2020, the July 2020-priced material in January and February 2021, and a portion of the August 2020-priced material in March 2021.

Elkem did not deliver 110 truckloads of SiLLOY® 170 to Allied under PO 422. As a result, from March 9, 2021, through September 10, 2021, Allied made "cover" purchases to replace the truckloads Elkem did not deliver. Allied's cover purchases were made at prices in excess of the contract price in PO 422 had Elkem continued to supply all outstanding SiLLOY® 170 after March 1, 2021, at the price mechanism contained in PO 422.

Allied says that based on Elkem's representation in September 2020 that it would "roll over" PO 422 until fulfilled and its silence regarding its dwindling supply of SiLLOY® 170, Allied did not go into the market to secure an alternative source of supply for silicon alloy product prior to March 2021, and had to scramble to find spot purchases (at a higher price) to make up for the undelivered truckloads. Elkem, however, points out that Allied had purchased silicon from other suppliers between September 18, 2020, and February 16, 2021.

According to Allied, had Elkem informed Allied that it was not planning to deliver all truckloads of SiLLOY® 170 under PO 422 unless Allied took all deliveries by a date certain, Allied would have secured an alternative source of supply.

13

### *SiLLOY® 130*

The parties agree that SiLLOY® 130 is a "more valuable" product than SiLLOY® 170, as it has a higher purity.  Dkt. # 106, ¶ 45.  Allied's processes would change with a higher purity versus lower purity alloy product—the amount of alloy needed depends on the quality, because Allied is always required to produce to specifications.  Allied's expert testified that it "should not be a big deal" if the company switched from using SiLLOY® 170 to SiLLOY® 130, but the customer needed to be informed of any change.  Dkt. # 92, at 132.  Allied's expert further testified that a switch to SiLLOY® 130 could take place "with no adverse effect in Allied's processes."  Dkt. # 106, ¶ 46.

### *Unpaid Invoices*

Between January and March 2021, Elkem shipped and Allied accepted 14 truckloads of SiLLOY® 170.  Under the terms of the 2020 Contract, payment was due "Net 45 Day from the original delivery date" of each truckload.  Allied has not made payment on the invoices for those 14 truckloads.  According to Allied's accounting records, $516,805.02 remains due for these shipments under the 2020 Contract.

The 2020 Contract contains a set-off provision, which states: "Set-Off.  All claims for money due or to become due [to] SELLER from BUYER shall be subject to set-off by BUYER by reason of any counterclaim arising out of this or any other transaction with SELLER."  Dkt. # 92, at 21, ¶ 20.  Allied contends it was not required

to make payment based on this provision in the contract. Elkem denies Allied is entitled to a set-off.

After the parties' relationship soured, Allied brought this action against Elkem alleging breach of contract and fraudulent concealment. Elkem filed a counterclaim for breach of contract regarding the unpaid invoices. Based on the above undisputed facts, Elkem now moves for summary judgment on Allied's breach of contract and fraudulent concealment claims, as well as on its counterclaim for breach of contract. Allied moves for partial summary judgment on its breach of contract claim.

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869–70 (S.D. Ind. 2018).

## DISCUSSION

### I.    Allied's Motion for Partial Summary Judgment

In its motion for partial summary judgment, Allied argues that Elkem breached the 2020 Contract on March 1, 2021, in two ways. First, Elkem breached the contract when it refused to deliver the remaining truckloads of SiLLOY® 170 under PO 422. Second, Elkem breached the contract when it refused to negotiate any extension of PO 422 and instead offered to convert Allied to SiLLOY® 130 at a higher price. Allied additionally argues that to the extent the December 2020 stability date and the January 31, 2021 date in PO 422 can be read as "firm" cut-off dates, Elkem's statement that PO 422 would roll over until fulfilled, silence regarding enforcement of a January 31, 2021 deadline, and delivery of truckloads after January 31, 2021, amounted to a waiver of that deadline.

16

Elkem, in response, argues that it is entitled to summary judgment on Allied's breach of contract claim because it provided Allied with PO 422's contemplated short extension by making deliveries beyond January 31, 2021, and it had no obligation to deliver SiLLOY® 170 beyond March 11, 2021, because the contract expired by that point.

The 2020 Contract, as a contract for the sale of goods, is governed by the Illinois Commercial Code ("UCC"). Under the UCC, written contract terms may be explained or supplemented by course of performance, course of dealing, or usage of trade. *See* 810 5/2-202. The UCC is clear that the express terms of a contract should be harmonized with the parties' course of performance, course of dealing, and the usage of trade. *See* 810 ILCS 5/1-303(e). In the event this cannot be done, express terms prevail over all three, course of performance prevails over course of dealing and usage of trade, and course of dealing prevails over usage of trade. *See id*.

Allied's breach of contract claim turns on the question of at what point Elkem was no longer obligated to supply SiLLOY® 170 under the 2020 Contract pricing. As explained below, the text of the 2020 Contract and PO 422, in what is affirmatively stated and in what is omitted, renders the intent of the parties ambiguous. And in assessing the evidence of record regarding the parties' course of performance and course of dealing[8], it is evident that a genuine issue of material fact exists with respect

---

[8] Neither party put forth any evidence or argument regarding usage of trade.

to the parties' intent. *See Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 818 (7th Cir. 1999).

### A. Express Terms

Elkem argues the Court need look no further than the express terms of the 2020 Contract, which Elkem asserts states a specifically-negotiated express deadline for delivery of January 31, 2021. Elkem points out that the original terms proposed by Mr. Wolf included a sentence that all truckloads were to be delivered not later than December 31, 2020, but after a discussion between Mr. Wolf and Mr. Fink, the offer was revised to state that Allied "will intend to release all truckloads under the PO for delivery not later than January 31, 2020. However, Elkem will be willing to negotiate a short extension if needed." Dkt. #92, at 16. Elkem says had the parties intended a "flexible" delivery deadline permitting Allied to perpetually order until all 110 truckloads were fulfilled, there would have been no need to negotiate and revise the original offer, and "to give no legal effect to the January 31, 2021 end date would render the provision meaningless, and contrary to the intent of the parties." Dkt. # 104, at 5 (citing *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601, ¶ 21). In the Court's view, the matter is not so clear cut and an examination of the parties' course of performance and course of dealing is necessary.

### B. Course of Performance

The Court first looks to the parties' course of performance, which "can aid in interpretation of a written contract by shedding light on the understanding between the

parties." *Midwest Builder Distrib. v. Lord & Essex*, 383 Ill. App. 3d 645, 673 (2007). A "course of performance" is "a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." 810 ILCS 5/1-303(a).

Allied asserts that "[t]he parties' course of performance of PO 422 confirms that the parties were willing to be flexible with delivery dates." Dkt. # 94, at 13. Elkem, on the other hand, argues that what Allied views as the parties' course of performance under PO 422 was related only to "the *internal* schedule of monthly deliveries," and "[t]here could be no course of performance . . . with respect to the deadline for delivery of all truckloads under the PO – which was a one-time, final event." Dkt. # 104, at 5 (emphasis in original). Even if true, though, Elkem *did* deliver—without objection—multiple truckloads after January 31, 2021, which indicates some level of flexibility.

### C. Course of Dealing

A "course of dealing" is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 810 ILCS 5/1-303(b). Allied makes much of the fact that PO 117 was not completed until five months past the contract's stated delivery timeframe, and says this extension is evidence of the kind of extension Allied expected with PO 422. In the Court's view,

however, this five-month extension is not significant as Allied would have one believe. Early 2020 saw the onset of the Covid-19 pandemic. In those initial months, many businesses were forced to shut down or significantly adjust the way they operated. Business owners were compelled to make changes to their operations that they would never have considered absent such extraordinary circumstances. With the exception of those initial months of the pandemic, the record shows that in prior contracts and in PO 422, Allied ordered truckloads every month, even if the amount was not the number contemplated at the time of contracting. Had things proceeded in the typical fashion and had Allied placed its April, May, and June 2020 orders in January, February, and March 2020, PO 117 would have been completed in early March—only about a month and a half past the stated delivery deadline in PO 117.

This, then, tracks with Elkem's willingness to deliver truckloads under PO 422 into February and March 2021. It also tracks with the 2017 Contract, which was fulfilled two months after the delivery timeframe ended. Notably, deliveries under the 2017 Contract, the 1H2019 Contract, and PO 117 were much closer to being fulfilled at their stated delivery deadlines (around one month behind) than was PO 422 as of January 31, 2021. The 2017 Contract was for 9 truckloads a month and had 11[9] truckloads remaining at the end of the delivery timeframe. The 1H2019 Contract was

---

[9] Or possibly nine, *see supra*, n.2.

for 14 truckloads a month and had 14 truckloads remaining. PO 117 was for 12 truckloads a month, and 13 remained at the end of the delivery timeframe.

Allied argues that "[w]hen read in harmony with performance of PO 117 and PO 422, including Elkem's repeated and consistent acceptance of delivery requests regardless of when they were placed without objection, the undisputed evidence shows that the parties understood and intended for PO 422 to run until all 110 truckloads were delivered, *not* until some arbitrary date unilaterally selected by Elkem." Dkt. # 95, at 16 (emphasis in original). Elkem calls out the absurdity of such a position, arguing that under Allied's interpretation of the contract terms, Allied could order truckloads under PO 422 years later, yet still pay based on the pricing from 2020. Allied then changes its tune and asserts that it never argued that the flexibility in delivery schedules meant that the parties intended for the contract to run perpetually and urges the Court to "reject this strawman argument, particularly in light of Allied's immediate demand for all remaining truckloads" on March 1, 2021. Dkt. # 111, at 6. "Allied simply wanted the opportunity to negotiate a short extension if the parties' goal for the intention to release deliveries was not met—as in fact occurred." *Id.* at 6–7.

But what did the parties mean by "short" extension? One month? Six months? A year? There is evidence in the record from which a reasonable jury could conclude that Elkem, for its part, understood the parties' intention to be that Elkem's delivery obligations under the 2020 Contract would continue until all 110 truckloads were delivered, or at least extend past March 2021. For example, in his September 15, 2020

21

email to Mr. Saethre, Mr. Wolf noted that Allied was months behind on the 2020 Contract and that "Allied will expect for us to honor our existing contract *until it's fulfilled*." Dkt. # 97-25, at 2 (emphasis added). Mr. Wolf also reported on September 18, 2020, that Mr. Fink "was happy to hear that [Elkem] will be rolling over the existing agreement [PO 422] *until it's fulfilled*." Dkt. # 97-26, at 2 (emphasis added). At a December 2020 board meeting, it was noted the 2020 Contract would "carry over *well into 2021*." Dkt. # 97-29, at 9 (emphasis added). And Mr. Wolf's February 26, 2021 internal email indicates that the 2020 Contract was still in effect as of that date. *See* Dkt. # 97-8, at 2 (asking, "[d]o we allow the current agreement to *run its course*?" and stating, "[i]f we *cancel the current agreement* and suggest a structure *for a new agreement* . . . we run the risk of losing Allied's business[.]") (emphasis added). Mr. Wolf's email reiterated the key provisions of the 2020 Contract (that Allied intends to release all truckloads for delivery no later than January 31, 2021 and that Elkem would be willing to negotiate a short extension). In response to that email, Mr. Dybwad suggested that Mr. Wolf "discuss a termination *of the present contract* with Allied." Dkt. # 97-32, at 2 (emphasis added).

Elkem was aware of how far behind Allied was in ordering under PO 422, and while Elkem discussed the matter internally, nothing in the record suggests Elkem relayed its concerns to Allied or otherwise indicated it would not supply the remaining truckloads under the 2020 pricing after March 11, 2021, because it viewed the contract as expired as of a certain date. In fact, there is no evidence in the record of any

22

communication whatsoever between the September 2020 conversation where Mr. Fink was "happy to hear" the 2020 Contract would roll over until fulfilled and March 1, 2021, when Elkem informed Allied it would not be supplying more than five additional truckloads of SiLLOY® 170.

Yet there is also evidence that would permit the conclusion that the parties understood January 31, 2021, to be the final delivery deadline, and/or that a reasonable short extension would be one to two months. If the parties did not consider January 31 a deadline, what was the point in negotiating the change in language or the change in date? Elkem makes a persuasive argument, but not so much so that no reasonable juror could not find in favor of Allied. Nor is Allied's case so strong that no reasonable factfinder could find in favor of Elkem.

**D. Waiver**

Next, Allied argues that, to the extent the December stability date or the date by which Allied intended to release all truckloads can be viewed as a hard and fast deadline, Elkem waived its right to enforce that deadline.

Before diving in, the Court must first address Elkem's argument that Allied forfeited its waiver argument by failing to raise the "distinct factual theor[y]" in its amended complaint. Dkt. # 104, at 9. As Elkem recognizes, however, a complaint does not have to reveal legal theories. *See Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). Here, Allied is not attempting to raise a new claim or inject new facts into the litigation. It has always been Allied's position that Elkem breached its

23

contractual obligation to deliver all 110 truckloads of SiLLOY® 170 at the 2020 Contract prices. Determining whether a breach occurred requires an analysis of the contract terms and the parties' course of performance and course of dealing. *See* 810 ILCS 5/2-202. And course of performance may give rise to waiver of express contractual terms. *See* 810 ILCS 5/1-303(f). Elkem cannot credibly claim to be surprised or prejudiced by Allied's waiver argument at summary judgment, and the parties had ample opportunity to brief the matter. Thus, the Court will consider the merits of Allied's waiver argument in addressing Allied's motion.

Under the UCC, the parties' course of performance may "give rise to waiver of express contractual terms if those terms are not strictly adhered to." *Midwest Builder*, 383 Ill. App. 3d at 673; 810 ILCS 5/1-303(f) (a course of performance is relevant "to show a waiver or modification of any term inconsistent with the course of performance."). Waiver is "an intentional relinquishment of a known right." *Id.*; *see also Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009). Although waiver can be implied by the parties' conduct, courts will find an implied waiver only if the waiver is clearly inferable from the circumstances. *Id.*; *see also Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 105 (1991) ("Implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver."); *Delta Consulting Grp.*, 554 F.3d at 1140 ("the act relied on to constitute the waiver must be clear, unequivocal and decisive.").

The policy behind this broad doctrine of waiver in contract law is to "prevent the waiving party from 'lull[ing] another into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance.'" *Id.* at 674 (quoting *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 235 Ill. App. 3d 224, 233 (1992)). "While the question of waiver may be resolved as a legal matter in certain cases, the question becomes one of fact where the facts necessary to support a finding of waiver are disputed or reasonable minds could draw different inferences from the evidence." *Wolfram P'ship v. Lasalle Nat'l Bank*, 328 Ill. App. 3d 207, 225 (2001).

Here, Allied has the burden of proving that Elkem waived its right to stop delivering under the 2020 Contract pricing. *See Claxton v. Bd. of Trs. of the City of Alton Firefighters' Pension Fund*, 2023 IL App (5th) 220200, ¶ 29. Allied argues that Elkem never told Allied it was going to insist on adherence to the stated delivery schedules or objected to Allied's delayed ordering. Instead, Allied says, Elkem assured Allied that PO 422 would be rolling over until fulfilled and continued filling orders after January 31, 2021, then "pulled the proverbial rug out from under Allied by departing from the parties' historic practice and unilaterally declaring its supply obligations at an end." Dkt. # 95, at 18.

Elkem argues that Mr. Wolf's internal comment that Allied was "happy to hear" that the 2020 Contract would be rolled over until fulfilled was not an unambiguous and clear relinquishment of the right to cease deliveries at 2020 pricing "at some commercially reasonable point after January 31, 2021." Dkt. # 104, at 12. The Court

25

finds that, at a minimum, a question of fact exists on the issue of waiver. Summary judgment is not warranted on this basis.

### E. Failure to Negotiate

Lastly, Allied argues that, in addition to its failure to supply all 110 truckloads of SiLLOY® 170, Elkem further breached PO 422 "when it refused to, and was unable to, negotiate a 'short extension' of that agreement." Dkt. # 95, at 18. Again, PO 422 expressly stated: "Allied Metal Company will intend to release all truckloads on the PO for delivery not later than **January 31, 2021**. However, Elkem will be willing to negotiate a short extension if needed." Dkt. # 97-22, at 3 (emphasis in original).

Allied says that when Elkem contacted Allied on March 1, 2021, to report for the first time that it would not deliver any more SiLLOY® 170 beyond its remaining stock, this was a refusal to negotiate any further extension of PO 422. Instead, Elkem offered to "convert" Allied to SiLLOY® 130 at the then-current Platts pricing. And when Allied demanded delivery of all outstanding truckloads of SiLLOY® 170, Elkem refused—it couldn't negotiate an extension because it didn't have the stock.

In response, Elkem argues that it did not breach PO 422 because "Allied received the benefit of its bargain for a short extension, *without even having to negotiate*." Dkt. # 104, at 15 (emphasis in original). According to Elkem, the course of dealing prior to the 2020 Contract "could arguably establish that one month's worth of shipments may roll into a following year." *Id.* Because every prior "short extension" had been, at most, one month's worth of deliveries, Elkem says it had no obligation based on a course of

26

dealing to deliver more than 10 truckloads beyond the January 31, 2021 release deadline.

The Court agrees with Allied that offering a different product at a new and higher price is not an offer to extend PO 422, it is an offer to enter into an entirely new contract. Based on the evidence, a reasonable jury could conclude that Elkem failed to negotiate an extension as contemplated at the time of contracting. But a reasonable jury could also conclude that it met its obligations. For example, the conversation that led Mr. Wolf to report that Mr. Fink was happy to hear PO 422 would roll over until fulfilled might have constituted a negotiation of a short extension—we don't know what was said in that conversation. Because a question of fact exists regarding whether Elkem breached its obligation to negotiate, Allied is not entitled to summary judgment on this basis.

## II. Elkem's Motion for Summary Judgment

Moving on to Elkem's motion, Elkem moves for summary judgment in its favor on Allied's breach of contract and fraudulent concealment claims, as well as on its counterclaim for breach of contract.

### A. Breach of Contract Claim

For the reasons explained above, questions of fact preclude the entry of summary judgment in either party's favor on Allied's breach of contract claim.

### B. Fraudulent Concealment Claim

In order for Allied to demonstrate fraudulent concealment under Illinois law, it must prove: (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that Allied could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that Allied would have acted differently had he been aware of it; and (5) that Allied's reliance led to its injury. *Trs. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002). Elkem argues it is entitled to summary judgment in its favor because Allied cannot show the concealment of a material fact or reliance to its detriment.

In the amended complaint, Allied alleged that "Elkem's intentional failure to inform Allied that it would not and could not honor PO 422 until all ordered loads were delivered, and that it would be impossible for Elkem to provide all remaining truckloads under PO 422, was an omission of material fact." Dkt. 50, ¶ 48. Elkem argues that its diminishing inventory of SiLLOY® 170 was immaterial because Elkem "had sufficient inventory of a higher quality product (SiLLOY 130) to fulfill any orders that Elkem would be obligated to supply under the 2020 Contract." Dkt. # 110, at 7. Therefore, Elkem says, Allied cannot prove a concealed material fact "that it would be impossible for Elkem to provide all remaining truckloads under PO 422." Elkem further asserts

28

that its conversion to SiLLOY® 130 was immaterial based on Allied's admission that it always preferred a higher purity silicon product, and it always depended on the price. According to Elkem, "there is only one possible logical inference from these two premises: Allied would have accepted SiLLOY® 130 if it had been provided at the SiLLOY® 170 pricing under the 2020 Contract." Dkt. # 110, at 8. Maybe it would have, or maybe not. That is a question of fact for the jury.

### C. Counterclaim for Breach of Contract

Finally, Elkem argues that it is entitled to summary judgment on its counterclaim for breach of contract because Allied admits that it has not paid Elkem for the delivery of fourteen truckloads between January 2021 and March 2021. Allied, however, argues Elkem is not entitled to summary judgment on its counterclaim because of the 2020 Contract's set-off provision, which states: "Set-Off. All claims for money due or to become due [to] SELLER from BUYER shall be subject to set-off by BUYER by reason of any counterclaim arising out of this or any other transaction with SELLER." Dkt. # 92, at 21, ¶ 20. Because Elkem is not entitled to summary judgment on Allied's breach of contract and fraud claims, Elkem's motion for summary judgment is also denied as to Elkem's counterclaim.

## **CONCLUSION**

For the foregoing reasons, Elkem's Motion for Summary Judgment [91] is denied and Allied's Cross-Motion for Partial Summary Judgment [94] is denied. Telephonic status hearing is set for 10/24/2024 at 10:00 a.m.

It is so ordered.

_____

Charles P. Kocoras

United States District Judge

Date: September 26, 2024